| | |
|---|---|
| Robert M. Castle, III (TX SBN 24036338)<br>COOPER & LYSTER, PLLC<br>6300 Ridglea Place, Suite 405<br>Fort Worth, Texas 76116<br>(817) 738-7000<br>*Rob@lysterlaw.com*<br>*Pro Hac Vice Forthcoming*<br>*Counsel for Plaintiffs* | Benjamin J. Rowland (7-5654)<br>DAVIS & CANNON, LLP<br>422 W. 26th Street<br>Cheyenne, Wyoming 82001<br>(307) 634-3210<br>*Browland@davisandcannon.com*<br>*Counsel for Plaintiffs* |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| MILLER GENERAL HEALTH STORE, CO., a Nevada corporation, DAVID MILLER, an individual, and TERRI MILLER, an individual,<br><br>Plaintiffs,<br><br>    v.<br><br>TEAM BRAVE, LLC, a Wyoming limited liability company,<br><br>Defendant. | Civil Action No._____ |

## COMPLAINT

Plaintiffs Miller General Health Store, Co. ("MGHS"), David Miller ("D. Miller") and Terri Miller ("T. Miller," collectively with D. Miller, the "Millers," and the Millers and MGHS are collectively referred to as "Plaintiffs"), by and through their undersigned counsel, as and for their complaint against Team Brave, LLC ("Brave") state as follows:

## INTRODUCTION AND NATURE OF ACTION

This is a straightforward breach of contract action.  Plaintiffs built a successful business as an independent coach for Optavia, a multilevel marketing company that offers meal solutions and coaching to help people lose weight and live healthy lifestyles.  Following years of declining performance by Optavia and changes to leadership and culture, the Millers decided to sell certain assets of MGHS (the business entity they used inside of Optavia).  Brave and its owners, who were familiar with MGHS, wanted to purchase those assets from MGHS.

The parties entered into a transaction that was memorialized in multiple documents, and the purchase price was to be paid over time under the terms of a Purchase Agreement and corresponding Promissory Note and also in the form of fees generated by a Consultation Agreement (as defined below).  The Consultation Agreement made business sense, as part of the assets Brave was acquiring included other revenue streams from other independent coaches who had been recruited to Optavia by the Millers or who had signed up to be coaches under the Millers.  Notably, the relationship between the Millers and the coaches in their downline was an important part of the success of MGHS.  *See* paragraph 9, *infra*, for further information concerning the organizational relationship and structure of the coaches to one another.

Within a few months of that transaction becoming effective, Brave announced it was investigating rumors the Millers breached the non-solicitation provision.  At that time, and based solely on rumors and misplaced, erroneous beliefs, Brave unilaterally and immediately ceased all payments to MGHS and the Millers under the Promissory Note and Consultation Agreement, engaging in unmerited, damaging self-help.  Nothing in any of the agreements permits self-help, and Brave's actions are the antithesis of applicable law, as they have decided to take matters into their own hands and to usurp, circumvent, and ignore the authority of the Court.  The failure to make payments when due constitutes a material breach of the Promissory Note.  Indeed, Brave

continues to reap the benefits of the assets sold pursuant to the Purchase Agreement but has failed to pay the Millers for months on end.

Further, the Millers had been one of the most successful coaches at Optavia, and they were extremely familiar with understanding how to succeed at Optavia and how to work with, motivate, and get maximum effort from their coaching downline (which, in turn, generated revenue for MGHS). Despite a failing business and dissension and dissatisfaction in the ranks of coaches Brave had inherited as part of the transaction (as Brave's leadership was not familiar with and has proven to be ineffective in working with those coaches), which would have benefited from the Millers' consulting efforts, Brave's leadership elected, in bad faith, to terminate the Consultation Agreement.

Adding insult to injury, Brave again recently reinforced its intention to engage in even more self-help, stating that it would continue withholding all funds and set off its purported damages, if any, which have never been determined by any Court. In essence, Brave has materially breached the transaction documents by not making the payments required (while continuing to receive all of the revenue and benefit generated from the assets Plaintiffs sold) and by terminating the Consultation Agreement in bad faith. Further, Brave has supplanted the Court's authority and impermissibly given itself a pre-suit garnishment by withholding payments that are past due and owing while continuing to receive 100% of the revenue from those assets. Enough is enough, and Plaintiffs have been forced to commence litigation to enforce the agreements, obtain the payments that are due and owing, and to curtail Brave from taking the law into its own proverbial hands.

## PARTIES

1.     Plaintiff MGHS is a corporation formed and existing under the laws of the State of Nevada with a principal place of business in Ridgefield, Washington.

2.      Plaintiff D. Miller is a resident of, and at all relevant times resided in, the State of Washington.

3.      Plaintiff T. Miller is a resident of, and all relevant times, resided in the State of Washington.  The Millers are the two shareholders of Plaintiff MGHS.

4.      Defendant Brave is a limited liability company formed and existing under the State of Wyoming.  Brave's principal place of business is 1684 Cedar Creek Drive, Star Valley Ranch, Wyoming 83127.  Brave's registered agent is CT Corporation Systems, 2232 Dell Range Blvd., Suite 200, Cheyenne, Wyoming 82009.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between each Plaintiff and each Defendant, and the amount in controversy exceeds $75,000.  Diversity of citizenship exists because MGHS is a Nevada corporation, the Millers are citizens of the State of Washington, Brave is a Wyoming LLC, David Blanchard, a member of Brave, is a citizen of the State of Utah, and Brian Drollinger, a member of Brave, is a citizen of the State of Wyoming.

6.      Personal jurisdiction over Defendants is proper.  Defendant Brave has agreed to submit to the jurisdiction of this Court when it agreed that the "state and federal courts located in Wyoming shall have jurisdiction and venue for all proceedings arising from or related to [the Purchase Agreement and the Promissory Note] or any transaction contemplated by this Agreement."  Similarly, Defendant Brave further submitted to the jurisdiction of this Court when it agreed that "[t]he courts in Wyoming have exclusive jurisdiction over any dispute related to this [Consulting] Agreement."

7.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of Wyoming.

## FACTS

8.    MGHS was an independent Coach associated with OPTAVIA, LLC ("Optavia"). Optavia is affiliated with the publicly-traded company, Medifast, Inc., and is a direct-selling program that is known for combining portion-controlled meal replacements with coaching.

9.    A direct sales program is a business model where products or services are sold directly to consumers or businesses, without using a third-party.  Optavia's business model involved Optavia selling products directly to consumers through a network of independent distributors (known as Coaches), who earn income not only from their own sales but also from the sales of the people they recruit into the network, creating a multi-level structure often called "multi-level marketing" (MLM) where distributors can earn commissions from multiple levels of their recruited team; essentially, selling products directly to customers while also building a sales team by recruiting others to do the same.

10.    Following a change in management and the emergence of GLP-1s (new weight loss prescriptions), Optavia's product lines, revenue, profitability, and business have consistently declined in recent years.  Indeed, in its Third Quarter Earnings call on November 4, 2024, Optavia reported that its (1) revenue decreased 40.6% year-over year, (2) gross profit decreased 40.4% year-over-year, (3) its number of active, earning Optavia coaches had decreased 36.3% from the prior year, (4) its active earning coaches had experienced a decrease in average revenue by 6.7%, and (5) it expected a Fourth Quarter loss per share ranging from $0.10 to $0.65.  *See* Yahoo! Finance (Nov. 4, 2024), https://yhoo.it/4gVKXSI.  These results demonstrated Optavia's continued downward performance.

11.    As a result, in the change in Optavia's management, which created a significant culture change, and given the declining performance of Optavia, the Millers decided to leave Optavia and to sell MGHS's assets.  On January 16, 2024, Plaintiffs, on the one hand, and Brave,[1] on the other hand, entered a transaction wherein Plaintiffs sold certain of MGHS's assets to Brave. The parties memorialized this transaction in a series of documents including a Purchase Agreement, a Promissory Note, and a Consultation Agreement (collectively, the "Transaction Documents), which they dated to be effective as of February 1, 2024.  Brave was required to pay for MGHS's assets over time in the form of a promissory note and guaranteed consulting fees pursuant to the Consulting Agreement.

12.    Under Section 2.4 of the Purchase Agreement, Brave was required to execute and deliver to MGHS a Promissory Note in the original principal amount of $7,157,526 (the "Purchase Price").

13.    Section 3 of the Purchase Agreement, including Sub-Sections 3.1-3.4, identified the assets to be transferred by MGHS to Brave.

14.    The Promissory Note, in which Brave was the maker, was for the Purchase Price and required interest at 5% compounded annually and required payments over ten (10) years (or 120 monthly payments).

15.    The Promissory Note required payments to begin on the earlier of March 15, 2024 and two business days after Brave's receipt of the Actual Monthly Income, and these payments

---

[1] While Brave, LLC signed the documents as the Purchaser in the Purchase Agreement, there is no entity registered with the Wyoming Secretary of State with that name.  Mr. Brian Drollinger and Mr. David Blanchard, the purported Brave, LLC members are in fact Team Brave, LLC members, which, according to the Wyoming Secretary of State, was formed on January 29, 2024, approximately two weeks after the parties signed the transaction documents.  Stated another way, Messrs. Drollinger and Blanchard had not formed Team Brave, LLC as of the date of signing.

were required to continue and became due on the earlier of the 15th day of each subsequent month and two business days after Maker's receipt of the Actual Monthly Income until the principal amount of the Purchase Price and applicable interest. The Promissory Note defined "Actual Monthly Interest" to mean for each month, all payments received by Brave for any commissions or bonuses paid by Optavia relating to the business assets MGHS sold to Brave.

16.    The Promissory Note required Brave to make payments in the Payment Amount, which is defined as an amount equal to the lesser of (1) $75,917 and (2) the product of Actual Monthly Income multiplied by 50%. The Promissory Note contains an amortization schedule setting forth specific payment amounts to be made over 120 months.

17.    The Promissory Note stated that if the Actual Monthly Income was less than a specific dollar amount, then the monthly Payment Amount shall equal the Actual Monthly Income multiplied by fifty percent (50%), and Brave was required to extend the amortization schedule to account for the difference between the reduced payment amount and $75,917 and to provide a copy of the modified amortization schedule to MGHS. To date, Brave has never provided MGHS with a modified amortization schedule.

18.    The Promissory Note specifically identified events of default to include the failure to pay any principal or interest due thereunder and the failure to observe or perform any covenant, obligation, condition, or representation contained therein.

19.    The Promissory Note also stated that upon the occurrence of an event of default, the interest rate shall increase to 8% per annum and further provided that if the note was given to an attorney for collection or enforcement or if suit is brought for collection or enforcement, then Brave shall pay MGHS all costs of collection and enforcement reasonably incurred by MGHS,

including without limitation reasonable attorney's fees and court costs, in addition to other amounts due.

20.    The final portion of the consideration for the sale of MGHS's assets was a Consultation Agreement, by and between MGHS and Brave.  Under the Consultation Agreement, which was Exhibit C to the Purchase Agreement, Brave agreed to pay MGHS $1,500 per hour for the consulting services performed by T. Miller and $2,500 per hour for the consulting services performed by the Millers.  The maximum amount of Monthly Fees was to be no more than $66,667 per month during the term of the agreement and $2,000,000 in the aggregate.

21.    Further, Brave agreed to pay MGHS a retainer of $400,000 on the Effective Date. Notably, the Consultation Agreement was a material inducement to MGHS to enter into the transaction contemplated by the Transaction Documents.

22.    After the transaction closed and became effective on February 1, 2024, the parties began performing under the Transaction Documents.  However, such performance was short lived.

23.    Specifically, on July 22, 2024, Brave sent an email to T. Miller expressing Brave's intent to ignore the express terms of the Transaction Documents and to instead engage in self-help by withholding payments to Plaintiffs.  Indeed, without first speaking to the Millers, Brian Drollinger and David Blanchard, the Brave members, stated that they had been informed of actions that they "***believe[d]*** conflict[ed] with the spirit of our agreements and ***potentially conflict*** with the terms of our agreements."  (emphasis added).  Brave went on to state that they had initiated an internal investigation to ascertain the validity of these concerns.  Despite the express terms of the Purchase Agreement and the Promissory Note (and the lack of any contractual authority allowing Brave to do so), Brave elected to engage in self-help and unilaterally determined that "[d]uring the period of this investigation, [Brave] will be suspending all payments to you and Miller General

Health Store, Co. under the Purchase Agreement and Consulting Agreement." Thus, without first talking to the Millers, without any contractual right to do so, and armed with nothing more than concerns, speculation, and beliefs, Brave, through its owners, stopped paying the Millers as required by the Transaction Documents. Brave continued, however, to enjoy and receive the revenue from assets purchased, thus enjoying the benefits from those assets without paying for them.

24.     The Millers subsequently responded to Brave's email and expressed concerns over the self-help and the fact that the failure to make the requisite payments was a material breach of the Purchase Agreement and Promissory Note.

25.     On August 5, 2024, Brave responded and explained that "[d]uring the period of this investigation, we have been advised to temporarily suspend all payments to you and [MGHS] under the Purchase Agreement and Consulting Agreement. This suspension was to be a precautionary measure intended to protect the interests of [Brave] during the ongoing investigation." Notably, Brave did not identify who had advised them to engage in self-help or identify any provision in any of the Transaction Documents permitting Brave to suspend or otherwise withhold any payments for any reason. Adding insult to injury, not only did Brave suspend payments to MGHS, it continued to receive commissions and bonuses from Optavia that were generated from the assets and business relationships Brave had purchased in the transaction while unilaterally deciding not to pay MGHS. In other words, Brave received 100% of the benefit of owning those assets without paying for them for more than six months as of the date hereof.

26.     Shortly thereafter, counsel for Brave responded that Brave was terminating the Consultation Agreement. Interestingly, Brave had bought assets from the Millers, which included the Coach license, which in turn provided access to revenue generated by other coaches who had

been recruited into or otherwise signed up with Optavia through the Millers. While the Millers had spent years working with and developing relationships with their downline coaches, Brave seemingly determined that consulting with the Millers would not be helpful. Upon information and belief, Brave's decision not to have the Millers consult with coaches they had recruited and trained damaged the revenue stream, and the decision to terminate the Consultation Agreement was an effort to reduce the total purchase price for the purchased assets by approximately 20%.

27.    Most recently, on December 17, 2024, counsel for Brave sent another communication stating that Brave was going to "hold the full amount of the contemplated payments in escrow, it intends to offset those amounts by the amount of damage being caused to the revenues associated with OPTAVIA COACH ID#2439901." For the first time, Brave claimed to be holding the payments in escrow – something that is not permitted under the Transaction Documents – without providing any information on the escrow account, the escrow agent, or the balance of such account. And it expressed its intention to engage in further self-help by offsetting the amount of the Purchase Price by the damages it, rather than the Court, claims and seemingly decides were caused. Indeed, Brave, without legal or contractual support and through engaging in self-help, has anointed itself to fill the role of judge and jury and seeks to take matters into its own hands while supplanting the authority of the Court.

**CLAIM 1 – Breach of Contract (Purchase Agreement and Promissory Note)**

28.    Plaintiffs repeat and re-allege the allegations in each preceding paragraph as if fully set forth herein.

29.    Plaintiffs and Brave entered into the Purchase Agreement and Promissory Note on January 16, 2024, which was effective as of February 1, 2024.

30.     The Purchase Agreement and Promissory Note were binding contracts between Plaintiffs and Defendant.

31.     Under the Purchase Agreement and Promissory Note, Brave was required to make monthly payments to MGHS to pay for the assets it had purchased from Plaintiffs.

32.     Beginning in July 2024, Defendant Brave unilaterally decided to cease making payments to MGHS as required under the Purchase Agreement and the Promissory Note. Defendant Brave has failed to make any of the required payments since July 2024 and has expressed intention to continue to withhold the required payments and to further reduce the Purchase Price unilaterally and without any legal basis to do so.

33.     Defendant Brave's failure to make the required monthly payments is a material breach of the Purchase Agreement and the Promissory Note.

34.     Defendant Brave's failure to make the required payments has damaged Plaintiffs.

35.     Under the Purchase Agreement and Promissory Note's express terms, Plaintiffs are entitled to the default interest rate of eight percent (8%), compounded annually.

36.     Under the Promissory Note's express terms, MGHS is entitled to all collection costs reasonably incurred, including without limitation, its reasonable attorney's fees and court costs.

**CLAIM 2 – Breach of Covenant of Good Faith and Fair Dealing (Transaction Documents)**

37.     Plaintiffs repeat and re-allege the allegations in each preceding paragraph as if fully set forth herein.

38.     Under Wyoming law, every contract includes an implied covenant of good faith and fair dealing.

39.     The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of the agreement.

Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party.

40.     A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance, fails to act honestly in fact and in the observance of reasonable commercial standards of fair dealing in the trade, engages in subterfuge and evasions of performance, engages in overt subterfuge or inaction, evasion of the spirit of the bargain, rendering imperfect performance, abusing power to specify terms, conjuring up pretended disputes, rejection of performance for unstated reasons, or abuse of power to determine compliance or to terminate the contract.

41.     Plaintiffs were entitled to receive the benefit of the Transaction Documents, which combined to create the Purchase Price for MGHS's assets.  The Purchase Agreement, the Promissory Note, and the Consultation Agreement combined to provide the total consideration to be paid under this transaction.  Indeed, the transaction was structured the way that it was for tax reasons and at the request of Brave.

42.     Rather than remit payment under the Purchase Agreement and Promissory Note, Brave engaged in self-help under the pre-text of unspecified suspicions of non-compliance, *see supra* at para. 23, not in conformity with the clear contract language that requires payment and began withholding payments mere months after the closing of the transaction.  This decision and subsequent conduct are inconsistent with the agreed common purpose of an asset sale and the justified expectations of MGHS.  Further, Brave has expressly stated its intention to continue withholding all payments to Plaintiffs

43.     Similarly, the parties agreed to have the Consultation Agreement be part of the consideration paid for the assets at issue in the transaction.  The parties understood and agreed that

the consulting fees to be paid under that agreement were material to the overall transaction and that $2 million of the purchase price was agreed to be paid as consulting fees.

44.    However, despite taking over a large number of new independent coaches, who were familiar with the way the Millers had operated, and having access to the Millers, who were one of the most successful coaches in Optavia, Brave did not utilize the consulting services. Instead of performing under that agreement, Brave elected to improperly terminate it in bad faith.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests the following relief:

1.    Judgment be entered in favor of Plaintiffs on all of their claims;

2.    An award of all damages that were reasonably foreseeable that directly resulted from the breach;

3.    An award of an amount as would place Plaintiffs in the condition they would have been in if the other party had adequately performed the contracts less amounts that were saved by Plaintiffs;

4.    Prejudgment and post judgment interest at 8%;

5.    The expenses incurred in connection with collecting on the Promissory Note, including without limitation, attorneys' fees and court costs, as expressly agreed to by the parties; and

6.    Such additional relief as the Court deems fair and just.

### [SIGNATURE PAGE FOLLOWS]

Dated this 15th day of January 2025.

COOPER & LYSTER, PLLC

By:   /s/ Robert M. Castle, III
      Robert M. Castle, III (TX SBN 24036338)
      6300 Ridglea Place
      Suite 405
      Fort Worth, Texas 76116
      (817) 738-7000
      Rob@lysterlaw.com

      DAVIS & CANNON, LLP

By:   /s/ Benjamin J. Rowland
      Benjamin J. Rowland (7-5654)
      422 W. 26th Street
      Cheyenne, Wyoming 82001
      (307) 634-3210
      *Browland@davisandcannon.com*
      *Counsel for Plaintiffs*